UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF THE )<br>UNITED STATES OF AMERICA FOR )<br>AN ORDER PURSUANT TO )<br>18 U.S.C. § 3512 )<br> )<br>Request from Romania for Assistance in a )<br>Criminal Matter:  Bank and Business Records ) <br> ) | ML NO. ____ |

DOJ Ref. # CRM-182-59963

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 3512

The United States of America, moving by and through its undersigned counsel, respectfully submits this ex parte application for an Order, pursuant to 18 U.S.C. § 3512, appointing the undersigned attorney, Aaron P. Gershbock, Trial Attorney, Office of International Affairs (or a substitute or successor subsequently designated by the Office of International Affairs), as a commissioner to collect evidence from witnesses and to take such other action as is necessary to execute a request for assistance in a criminal matter from Romania. In support of this application, the United States asserts:

RELEVANT FACTS

1. The Romanian Ministry of Justice submitted a request for assistance (the Request) to the United States pursuant to the Treaty Between the Government of the United States of America and the Government of Romania on Mutual Legal Assistance in Criminal Matters, Rom.-U.S., May 26, 1999, S. TREATY DOC. NO. 106-20, as amended by the Protocol to the Treaty between the United States of America and Romania on Mutual Legal Assistance in

Criminal Matters signed in Washington on 26 May 1999, Rom.-U.S., September 10, 2007, S. TREATY DOC. NO. 110-11 (the Treaty).  As stated in the Request, the National Anti-Corruption Direction DNA's Department for Fighting Corruption Related Offenses is investigating a crime, specifically, misrepresentation, which occurred between on or about September 22, 2006, and July 29, 2009, in violation of the criminal law of Romania, namely, Article 244 of the Romanian Criminal Code.  A copy of the applicable law is included as Attachment A to this application.  Under the Treaty, the United States is obligated to render assistance in response to the Request.

2. According to Romanian authorities, on April 7, 2008, S.C. Toyo Motor Leasing IFN S.A. (S.C. Toyo Motor) set up a lease agreement with two other companies.  The lease agreement allowed one company (the lessee) to rent an aircraft for 48 months in exchange for $12,620,810.58 (VAT excluded).  The other company (the operator) would operate the aircraft during the lease period.  At the end of the lease, the lessee was required to cancel the lease, renew, or purchase the aircraft.

3. At the time the lease was signed, neither the lessee nor the operator were aware that S.C. Toyo Motor did not yet own the aircraft.  S.C. Toyo Motor was in the process of buying the aircraft from another company that will be referenced as CII.  By April 7, 2008, S.C. Toyo Motor had paid the full $10 million contract price.  The money had been paid to CII's bank in Texas, International Bank of Commerce, account number XXX6901.  But documents transferring title from CII to S.C. Toyo Motor were not signed until September 3 and 4, 2008.

4. Even so, the lessee and the operator were aware that CII had some control over the aircraft.  The lease agreement included a term that the aircraft would remain registered within the United States until the aircraft was shipped to Romania and registered there.  To effectuate

this term, CII took on additional obligations, all of which were accepted by S.C. Toyo Motor, the lessee, and the operator. On May 13, 2008, CII sent a document to S.C. Toyo Motor, the lessee, and the operator setting forth terms and conditions for use of the aircraft while it was still registered in the United States. Pursuant to these terms, between June 6, 2008, and August 2, 2008, the operator flew the aircraft 34 times as an aircraft registered in the United States.

5. On August 24, 2008, the lessee submitted the initial paperwork in Romania required to get the aircraft registered there. This led the lessee to discover that S.C. Toyo Motor never received title to the aircraft. Despite S.C. Toyo Motor paying the contract in full, CII had retained title to the aircraft even after signing conveyance documents on September 4, 2008.

6. Romanian authorities began an investigation into S.C. Toyo Motor. Romanian authorities have found evidence suggesting CII had already mortgaged the aircraft by April 7, 2008. They also found that on or about July 17, 2009, as a result of foreclosure proceedings, the aircraft was transferred to a U.S-based company that will be referenced as JHKD.

7. In support of this Request, our office obtained copies of certain documents from the U.S. Federal Aviation Administration (FAA). Regarding the purchase of the aircraft by CII, two FAA documents show a security agreement conveying the aircraft as collateral from CII to International Bank of Commerce: the first was executed on September 22, 2006, and recorded on October 18, 2006; the second was executed on July 31, 2007, and recorded on September 10, 2007. Regarding transfer of title for the aircraft from CII to S.C. Toyo Motor, an FAA document filed February 2, 2009, shows this transfer was made on September 4, 2008. Another FAA document, however, found a filing showing conveyance of the aircraft title insufficient.[1]

---

[1] This document, a letter from the FAA dated July 30, 2009, stated the insufficient conveyance document was filed on March 24, 2009. No document provided by the FAA matches this description; the closest in time is the document showing conveyance of title from CII to S.C. Toyo Motor, filed February 2, 2009.

Regarding the disposition of the aircraft in 2009, an FAA document indicates that an assignment and assumption agreement (with a related conveyance) was made from International Bank of Commerce to JHKD. This document was executed May 18, 2009, and recorded on July 29, 2009. A final related FAA document, dated July 17, 2009, indicates that CII, as a debtor, gave the encumbered aircraft via repossession to the designated successor of International Bank of Commerce, namely, JHKD.

8. To further the investigation, Romanian authorities have asked U.S. authorities to provide: (1) bank records from International Bank of Commerce pertaining to account number XXX6901 and ownership of or finances for the aircraft during or after 2006; (2) business records from CII pertaining to the aircraft; and (3) business records from JHKD pertaining to the aircraft and foreclosure proceedings.

## LEGAL BACKGROUND

### The Treaty

9. A treaty constitutes the law of the land. U.S. Const. art. VI, cl.2. The provisions of a treaty have equal footing with acts of Congress and are binding on the courts. See Asakura v. City of Seattle, 265 U.S. 332, 341 (1924); United States v. The Peggy, 5 U.S. 103 (1801); United States v. Emuegbunam, 268 F.3d 377, 389 (6th Cir. 2001). The provisions of a treaty should be construed liberally "to give effect to the purpose which animates it." United States v. Stuart, 489 U.S. 353 (368) (1989) (internal quotation marks omitted). To the extent that the provisions of a treaty are inconsistent with a preexisting statutory provision, the treaty supersedes the statute. Zschernig v. Miller, 389 U.S. 429, 440-41 (1968).

10. The United States and Romania entered into the Treaty to promote more effective cooperation and assistance between the parties in criminal matters. See Treaty, pmbl. The

Treaty obligates each party, upon request, to provide assistance to the other in criminal investigations, prosecutions, and related proceedings, including assistance in serving documents, obtaining testimony, statements, and records, and executing searches and seizures. Treaty, Article 1. In addition, the Treaty, like 18 U.S.C. § 3512, authorizes federal courts to use compulsory measures to further the execution of such requests. Treaty, Article 5(1) ("The competent judicial authorities . . . of the Requested State shall have power to issue subpoenas, search warrants or other orders necessary to execute the request.").

### 18 U.S.C. § 3512

11. When executing a treaty or non-treaty request for assistance from a foreign authority, an attorney for the government may file an application to obtain any requisite court orders under 18 U.S.C. § 3512. This section authorizes a federal court to issue such orders and provides in pertinent part:

> Upon application, duly authorized by an appropriate official of the Department of Justice, of an Attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

> \*   \*   \*

> [A]n application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia.

> \*   \*   \*

> The term "foreign authority" means a foreign judicial authority, a foreign authority responsible for the investigation or prosecution of criminal offenses or for proceedings related to the prosecution of criminal offenses, or an authority designated as a competent authority or central authority for the purpose of making requests for assistance pursuant to an agreement or treaty with the United States regarding assistance in criminal matters.

18 U.S.C. § 3512(a)(1), (c)(3), (h)(2).

5

12. Congress enacted this section to make it "easier for the United States to respond to [foreign] requests by allowing them to be centralized and by putting the process for handling them within a clear statutory scheme." 155 Cong. Rec. 6,810 (2009) (statement of Sen. Whitehouse); Foreign Evidence Request Efficiency Act of 2009, Pub. L. No. 111-79, 123 Stat. 2086.[2] This section provides clear authority for the federal courts, upon application duly authorized by an appropriate official of the Department of Justice, to issue orders which are necessary to execute a foreign request.

13. An application is duly authorized by an appropriate official of the Department of Justice when the Office of International Affairs, which serves as the "Central Authority" for the United States, has reviewed and authorized the request, and executes the request itself or delegates execution to another attorney for the government.[3] Upon such a duly authorized application, Section 3512 authorizes a federal judge[4] to issue "such orders as may be necessary to execute [the] request," including: (1) search warrants under Fed. R. Crim. P. 41; (2) orders for electronic records under 18 U.S.C. § 2703; (3) orders for pen registers or trap and trace devices under 18 U.S.C. § 3123; and (4) orders appointing a person to direct the taking of testimony or

---

[2] Prior to the enactment of 18 U.S.C. § 3512, the United States routinely utilized the procedures authorized by 28 U.S.C. § 1782 (the "commissioner" process) to execute requests from foreign authorities. See In re Request from the United Kingdom, 685 F.3d 1, 11 (1st Cir. 2012) (18 U.S.C. § 3512 provides a more streamlined process than 28 U.S.C. § 1782, the statute under which foreign requests were previously executed); see also Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 247-49 (2004) (describing history of Section 1782). When enacting Section 3512, Congress anticipated that improved U.S. handling of foreign requests would ensure reciprocity in response to U.S. requests for assistance in its criminal investigations. See, e.g., 155 Cong. Rec. 10,093 (2009) (statement of Rep. Schiff).

[3] The Attorney General, through regulations and Department of Justice directives, delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters. See 28 C.F.R. 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81A and 81B.

[4] The term "federal judge" includes a magistrate judge. See 18 U.S.C. § 3512(h)(1) and Fed. R. Crim. P. 1(b)(3)(B) (including a magistrate judge in the definition of federal judge).

statements and/or the production of documents or other things. See 18 U.S.C. § 3512(a)(1)-(b)(1). In addition, a federal judge may prescribe any necessary procedures to facilitate the execution of the request, including any procedures requested by the foreign authority to facilitate its use of the evidence. See In re Letter of Request from the Crown Prosecution Service of the United Kingdom, 870 F.2d 686, 693 (D.C. Cir. 1989) (court has discretion in prescribing procedures to be followed in executing foreign request under 28 U.S.C. § 1782); cf. White v. National Football League, 41 F.3d 402, 409 (8th Cir. 1994) (court may issue process necessary to facilitate disposition of matter before it); Fed. R. Crim. P. 57(b).

14. Section 3512 also authorizes any person appointed to direct the taking of testimony or statements and/or the production of documents or other things to: (1) issue an order requiring a person to appear and/or produce documents or other things; (2) administer any necessary oaths; (3) take testimony or statements; and (4) take receipt of documents or other things. 18 U.S.C. § 3512(b)(2). In ordering a person to appear and/or produce documents or other things, the person appointed, commonly referred to as the "commissioner," typically uses a subpoena entitled "Commissioner Subpoena." Any such subpoena or any other order, subject to subsection (d), may be served or executed anywhere in the United States. 18 U.S.C. § 3512(f). A copy of a "Commissioner Subpoena" is included as Attachment B.

## REQUEST FOR ORDER

15. The Office of International Affairs has reviewed and authorized the Request, and is executing the Request itself. Consequently, this application for an Order appointing the undersigned attorney as a commissioner to collect evidence from witnesses and to take such other action as is necessary to execute the Request has been "duly authorized" within the meaning of Section 3512. In addition, the Request was submitted by an appropriate "foreign

authority," i.e., the Romanian Ministry of Justice, the designated Central Authority in Romania for requests made pursuant to the Treaty, and seeks assistance in the investigation of misrepresentation – a criminal offense in Romania. Furthermore, the requested Order is necessary to execute the Request, and the assistance requested, i.e., the production of bank and business records, falls squarely within that contemplated by both the Treaty and Section 3512. Finally, this application was properly filed in the District of Columbia.

16. Both Section 3512 and the Treaty authorize the use of compulsory process in the execution of treaty requests comparable or similar to that used in domestic criminal investigations or prosecutions. Because subpoenas utilized in U.S. criminal proceedings (i.e., grand jury and criminal trial subpoenas) are issued without notice to any person other than the recipient (i.e., no notice to targets or defendants), orders and commissioner subpoenas issued in execution of a treaty request pursuant to Section 3512 and the applicable treaty likewise should require no notice other than to the recipients. This is true even if the Requesting State, as here, seeks financial records, because the Right to Financial Privacy Act, 12 U.S.C. §§ 3401 et seq., including its notice provisions, does not apply to the execution of foreign requests for legal assistance. Young v. U.S. Dept. of Justice, 882 F.2d 633, 639 (2d Cir. 1989), cert. denied, 493 U.S. 1072 (1990); In re Letters of Request from the Supreme Court of Hong Kong, 821 F. Supp. 204, 211 (S.D.N.Y. 1993); In re Letter of Request for Judicial Assistance from the Tribunal Civil de Port-Au-Prince, Republic of Haiti, 669 F. Supp. 403, 407 (S.D. Fla. 1987). Accordingly, this Court should authorize a commissioner to collect the evidence requested without notice to any person other than the recipients of the commissioner subpoenas.[5]

---

[5] Romanian authorities have not asked U.S. authorities to keep the Request confidential. Accordingly, the United States is not seeking authorization to issue a non-disclosure order, nor is it seeking an order to seal the court file.

17.     Therefore, the United States respectfully requests that this Court issue the attached Order, pursuant to 18 U.S.C. § 3512, appointing the undersigned attorney, Aaron P. Gershbock, Trial Attorney, Office of International Affairs (or a substitute or successor subsequently designated by the Office of International Affairs) as a commissioner, authorizing the undersigned to take the actions necessary, including the issuance of commissioner subpoenas, to obtain the evidence requested in a form consistent with the intended use thereof.

        Respectfully submitted,

        VAUGHN A. ARY
        DIRECTOR
        OFFICE OF INTERNATIONAL AFFAIRS
        OK Bar Number 12199

By: _/s/ Aaron Gershbock_
        Aaron P. Gershbock
        Trial Attorney
        CA Bar Number 266351
        Office of International Affairs
        Criminal Division, Department of Justice
        1301 New York Avenue, N.W., Suite 800
        Washington, D.C. 20530
        (202) 616-5275 telephone
        Aaron.Gershbock@usdoj.gov